UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES, ex rel. MATTHEW ZUGSBERGER and MATTHEW ZUGSBERGER,

Plaintiffs,

v.

T L PETERSON, INC., et al.,

Defendants.

Case No. 4:17-cv-02277-KAW

**ORDER GRANTING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

Re: Dkt. Nos. 65, 93

On May 3, 2018, Plaintiff and Relator Matthew Zugsberger ("Plaintiff" or "Zugsberger") filed a motion for partial summary judgment for instatement of maintenance and cure, payment of past maintenance and cure, and to set the maintenance rate. (Pl.'s Mot., Dkt. No. 65.)

The Court finds this matter suitable for resolution without hearing pursuant to Civil Local Rule 7-1(b). Upon consideration of the parties' filings, and for the reasons set forth below, the Court GRANTS Plaintiff's motion for partial summary judgment.

## I.    BACKGROUND

Plaintiff's general maritime law claims for maintenance and cure arise from injuries he allegedly sustained while employed by Defendants Galindo Construction Company, Inc. ("Galindo Construction") and Don Ron Galindo ("Ron Galindo") as a commercial diver between August and November 2016. (Decl. of Matthew Zugsberger, "Zugsberger Decl.," Dkt. No. 70 ¶ 2; Decl. of Ron Galindo, "Galindo Decl.," Dkt. No. 86, Ex. K ¶ 3.)

Defendant Galindo Construction worked as a subcontractor on the National Park Service ("NPS") project in Drakes Estero, near Point Reyes, California, from August 2016 until April 2017 ("the Project"). (Galindo Decl. ¶¶ 2-3; Decl. of John Williams, "Williams Decl.," Dkt. No.

United States District Court
Northern District of California

United States District Court
Northern District of California

86, Ex. M ¶ 2.) Galindo Construction subcontracted through T.L. Peterson to remove a collection of oyster racks from the water. (Galindo Decl. ¶ 2; Zugsberger Decl. ¶ 3.) T.L. Peterson was awarded a the contract, executed in June 2016, to dispose of debris from Drakes Estero at a "Class I Landfill" capable of receiving toxic materials, in exchange for $1.6 million. (Contract, Decl. of Nicholas Neidzwski, "Nedizwski Decl.," Dkt. No. 68, Ex. O at O-11.)

To remove the racks, Galindo Construction operated a mini-excavator, which was resting on a barge. (Decl. of David Schultz, "Schultz Decl.," Dkt. No. 86, Ex. N ¶ 3; Decl. of John Moats, "Moats Decl.," Dkt. No. 86, Ex. L ¶ 5.) Galindo employees Zugsberger and David Schultz would get in the water and rig a chain to the oyster racks so that the mini-excavator could pull the oyster racks onto the barge. (Schultz Decl. ¶¶ 3-4; Zugsberger Decl. ¶ 3.) Plaintiff performed the vast majority of this work diving off a vessel (the "Vessel") which was owned and/or operated by Galindo Construction and/or Ron Galindo. (Zugsberger Decl. ¶ 4.)

According to Plaintiff's medical records, on September 10, 2016, during the Project, he was seen by David Greene, MD, DABR. Dr. Greene noted in the History of Present Illness section ("HPI") that:

> The patient reports development of progressive erythema, progressing to blistering and ultimately desquamation of all exposed skin to include chiefly trunk, back, extensor and flexor surfaces of bilateral UE after skin exposure to water at a commercial dive site where he has been employed removing pilings and creosote treated lumber from a site in western Marin county.

(Neidzwski Decl., Ex. F at F-1.) Plaintiff also reported that he was not wearing full dive gear or protective hazmat gear at the time of exposure and was not fully submerging his head in the water "at the site." *Id.* As a result, Dr. Greene made the following assessment: "40 year old commercial diver with painful burns at exposed skin. Clinically consistent with chemical burn likely secondary to petrochemical or other toxic exposure. No evidence of systemic toxicity at this time." *Id.* at pg. F-2. Plaintiff contends that, while he continued to incur medical treatment and expenses from the injuries sustained during the Project, he has been unable to seek all necessary treatment, because he has not received any amount of cure and maintenance from Defendants. (Zugsberger Decl. ¶¶ 7-8, 15.)

On May 3, 2018, Plaintiff and Relator Matthew Zugsberger filed a motion for partial

summary judgment for instatement of maintenance and cure, payment of past maintenance and cure, and to set the maintenance rate. (Pl.'s Mot., Dkt. No. 65.) On July 3, 2018, Defendants filed a corrected opposition. (Defs.' Opp'n, Dkt. No. 86.) On July 10, 2018, Plaintiff filed a reply. (Pl.'s Reply, Dkt. No. 87.) Also on July 10, 2018, Plaintiff filed a Declaration of Nicholas J. Neidzwski in support of their reply. (Decl. of Nicholas Neidzwski in Support of Reply to Motion for Partial Summary Judgment, "Reply Neidzwski Decl.," Dkt. No. 88.) On July 17, 2018, Defendants filed objections to reply evidence, in which they also attempted to attach additional evidence pursuant to Civil Local Rule 7-3(d). (Defs.' Obj., Dkt. No. 92; Decl. of Lukas J. Clary Requesting Court Approval, Dkt. No. 92-1.) Defendants, however, did not obtain leave of court to submit new evidence, pursuant to Civil Local Rule 7-11, which would have provided Plaintiff an opportunity to respond, so those exhibits are stricken. The Court will, however, consider the objections. On July 26, 2018, Plaintiff filed a motion for leave to file additional evidence pursuant to Civil Local Rule 7-3(d). (Dkt. Nos. 93 & 94.) On September 7, 2018, Plaintiff filed another motion for leave to file additional evidence pursuant to Civil Local Rule 7-3(d). (Dkt. Nos. 103 & 104.) The two motions for leave and supporting declarations are similarly improper, because Plaintiff did not seek leave under the proper local rule, and untimely even if proper, so the documents are stricken and the motions for leave are both DENIED.

On July 31, 2018, the Court ordered the parties to submit supplemental briefing on the reasonable maintenance rate in the three locations where Plaintiff resided, and to address the propriety of the medical treatment Plaintiff seeks in his claim for cure. (Dkt. No. 95.) On August 17, 2018, Plaintiff filed his supplemental brief and supporting declarations from Dr. Greene and Nicholas J. Neidzwski. (Pl.'s Suppl. Br., Dkt. No. 96; Decl. of David Greene, "Greene Decl.," Dkt. No. 97; Decl. of Nicholas J. Neidzwski, "Suppl. Neidzwski Decl.Suppl. Neidzwski Decl.," Dkt. No. 98.) On August 31, 2018, Defendants filed their response. (Defs.' Resp., Dkt. No. 102.)

## II.    LEGAL STANDARD

A party may move for summary judgment on a "claim or defense" or "part of... a claim or defense." Fed. R. Civ. P. 56(a). Summary judgment is appropriate when, after adequate discovery, there is no genuine issue as to material facts and the moving party is entitled to

judgment as a matter of law. *Id.*; *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). Material facts are those that might affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). A dispute as to a material fact is "genuine" if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *Id.*

A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion, and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact. *Celotex,* 477 U.S. at 323. Where the moving party has the burden of proof at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for it. *S. Calif. Gas. Co. v. City of Santa Ana,* 336 F.3d 885, 888 (9th Cir. 2003). Once the moving party meets its initial burden, the opposing party must then set forth specific facts showing some genuine issue for trial to defeat the motion. *See* Fed. R. Civ. P. 56(e); *Anderson,* 477 U.S. at 250. The non-moving party must produce "specific evidence, through affidavits or admissible discovery material, to show that the dispute exists." *Bhan v. NMS Hosps., Inc.*, 929 F.2d 1404, 1409 (9th Cir. 1991). Conclusory or speculative testimony in affidavits and moving papers is insufficient to raise a genuine issue of material fact to defeat summary judgment. *Thornhill Publ'g Co., Inc. v. Gen. Tel. & Elecs. Corp.*, 594 F.2d 730, 738 (9th Cir. 1979). In deciding summary judgment, a court must view the evidence in the light most favorable to the nonmoving party and draw all justifiable inferences in its favor. *Anderson,* 477 U.S. at 255; *Hunt v. City of Los Angeles,* 638 F.3d 703, 709 (9th Cir. 2011).

Admiralty's approach, however, is "to do justice with slight regard to formal matters." *Cont'l Grain Co. v. The Barge FBL–585*, 364 U.S. 19, 25 (citation omitted). "The administration of maintenance should be 'easy and ready,' with 'few exceptions or conditions to stir contentions, cause delays, and invite litigations.'" *Barnes v. Sea Hawaii Rafting, LLC*, 889 F.3d 517, 538 (9th Cir. 2018) (quoting *Vella v. Ford Motor Co.*, 421 U.S. 1, 4 (1975)). While some courts have declined to resolve pretrial motions for maintenance and cure under a Rule 56 summary judgment standard, the Ninth Circuit recently held that such a standard and admiralty procedures are not incompatible. *Barnes,* 889 F.3d at 538. While it is often difficult for a party to prevail on summary judgment, "the seaman seeking maintenance has an easier task as a result of the breadth of the

shipowner's duty." *Id.* Indeed, "[t]o establish his entitlement to maintenance," the seaman need only prove that he "bec[ame] ill" or "injured while in the service of the ship." *Id.* (citing *Vella*, 421 U.S. at 3.) "The shipowner's duty to pay maintenance 'arises irrespective of the absence of shipowner negligence and indeed irrespective of whether the illness or injury is suffered in the course of the seaman's employment.'" *Id.* (quoting *Vella,* 421 U.S. at 4.) The obligation to pay maintenance and cure continues until the seaman reaches "maximum cure," which is recovery as complete as the injury allows. *Permanente S.S. Corp. v. Martinez*, 369 F.2d 297, 298-99 (9th Cir. 1966). "[S]o broad is the shipowner's obligation [that even] negligence or acts short of culpable misconduct on the seaman's part will not relieve (the shipowner) of the responsibility." *Vella,* 421 U.S. at 4 (quoting *Aguilar v. Standard Oil Co.*, 318 U.S. 724, 730-31 (1943)).

Thus, "in practice, a seaman will have little difficulty demonstrating his entitlement to maintenance under a summary judgment standard." *Barnes*, 889 F.3d at 539. As a result, a seaman's initial entitlement to maintenance and cure can be properly resolved on summary judgment, as can the amount of maintenance. *Id.* at 539-40.

### III.   DISCUSSION

As an initial matter, Defendants misstate the summary judgment standard for maintenance (funds to cover living expenses) and cure (funds to obtain necessary medical care) claims in admiralty cases. Despite their protestations that the motion is premature, Plaintiff need not show that there are no disputes of material fact that he was injured exactly as claimed, the extent thereof, or even causation. Instead, in order to establish his entitlement to maintenance, Plaintiff "need only prove that he 'bec[ame] ill or . . . injured while in the service of the ship.'" *Barnes v. Sea Hawaii Rafting, LLC*, 889 F.3d 517, 538 (9th Cir. 2018)(quoting *Vella v. Ford Motor Co.*, 421 U.S. 1, 3 (1975)). A shipowner's duty to provide maintenance and cure "arises irrespective of the absence of shipowner negligence and indeed irrespective of whether the illness or injury is suffered in the course of the seaman's employment." *Vella*, 421 U.S. at 4 (citing *Calmar S.S. Corp. v. Taylor*, 303 U.S. 525, 527 (1938)). Thus, the only issue to be decided at this juncture is whether Plaintiff was injured during his employment for the purposes of the Jones Act, and, if so, the amount of maintenance and cure to which he is entitled.

**A.     Maintenance and Cure Claim Requirements**

To establish pre-trial entitlement to maintenance and cure, the plaintiff bears the slight burden of demonstrating that:  (1) plaintiff was employed as a seaman, (2) plaintiff was injured in the service of the ship, and (3) plaintiff is incurring expenses for medical treatment, board, and lodging. *Dean v. Fishing Co. of Alaska, Inc.*, 177 Wash.2d 399, 409 (2013) (citations omitted). Plaintiff's burden is "relatively light."  *Id.* (citations omitted). "After a seaman has proved his initial entitlement to maintenance and cure, the burden shifts to the shipowner to prove that maximum cure has been reached." *Id.* at 409 (citing *Tuyen Thanh Mai*, 160 Wash.App. 528, 539 (2011)). The Court will address each element below.

**i.     Whether Plaintiff was employed as a seaman**

The first element is whether Plaintiff was employed as a seaman pursuant to the Jones Act. To establish seaman status, the maritime worker must have an "employment-related connection to a vessel in navigation," which requires that "[t]he worker's duties must contribute to the function of the vessel or to the accomplishment of its mission, and the worker must have a connection to a vessel in navigation (or an identifiable group of vessels) that is substantial in terms of both its duration and its nature." *Chandris, Inc. v. Latsis*, 515 U.S. 347, 376 (1995).  The threshold requirement of contributing to the ship's work is very broad, because "'[a]ll who work at sea in the service of a ship' are eligible for seaman status." *Id.* at 368 (quoting *McDermott Int'l, Inc. v. Wilander*, 498 U.S. 337, 354 (1991)). There is no dispute that Plaintiff satisfies the first requirement, as Defendants argue only that the ship was not in navigable waters, thus precluding Plaintiff's seaman status. (*See* Defs.' Opp'n at 9-14.)  Specifically, Defendant argues that Drakes Estero cannot bear commercial shipping due to being a land-locked estuary closed off by a long sandbar, rendering it inaccessible by motorboat during Plaintiff's employment. (Def.'s Opp'n at 12; Moats Decl. ¶ 13.) Plaintiff argues that Defendants misstate the law. (Pl.'s Reply at 4.)

**a.     Whether Drakes Estero is "navigable"**

Pursuant to the Code of Federal Regulations, "[n]avigable waters of the United States are those waters that are subject to the ebb and flow of the tide and/or are presently used, or have been used in the past, or may be susceptible for use to transport interstate or foreign commerce." 33

C.F.R. § 329.4. Generally, in order to be navigable, "the following conditions must be satisfied: (a) Past, present, or potential presence of interstate or foreign commerce; (b) Physical capabilities for use by commerce as in paragraph (a) of this section; and (c) Defined geographic limits of the waterbody." 33 C.F.R. § 329.5.

First, "it is sufficient to establish the potential for commercial use at any past, present, or future time." 33 C.F.R. § 329.6. This may be accomplished by showing the "historical use of canoes, bateaux, or other frontier craft, as long as that type of boat was common or well-suited to the place and period." *Id.* Despite Defendants' argument in opposition, there is no requirement that the waters be navigable during Plaintiff's employment or that it be navigable by motorboat. (*See* Def.'s Opp'n at 12.) Moreover, "the particular items of commerce may vary widely, depending again on the region and period. The goods involved might be grain, furs, or other commerce of the time." 33 C.F.R. § 329.6.

Perhaps more importantly, the United States Supreme Court has held that "[w]hen once found to be navigable, a waterway remains so." *United States v. Appalachian Elec. Power Co.*, 311 U.S. 377, 408 (1940). Here, in support of his position that Drakes Estero is navigable, Plaintiff presents a document titled "Land Use Survey & Economic Feasibility Report on Point Reyes National Seashore," which was prepared by the U.S. Department of the Interior. (Pl.'s Mot. at 18; Land Use Survey, Neidzwski Decl., Ex. K at 15-49). The reports states that "[f]or many years the produce from Point Reyes Peninsula was transported from Drakes Estero and Tomales Bay to the San Francisco markets in shallow-draft, coastal schooners." (Land Use Survey at 26.) Defendants do not dispute that Drakes Estero was previously used in interstate or foreign commerce, and the Land Use Survey also provides that Drakes Estero was well known to traders, whalers, and fur hunters of the United States, Mexico, Great Britain, and Russia. *Id.*

Rather than producing evidence that the waterway is not navigable, Defendants argue that the Land Use Survey is inadmissible, because it was not authenticated by Mr. Neidzwski's declaration, it lacks foundation, and is inadmissible hearsay.[1] (Defs.' Opp'n at 14.) The Court

---
[1] In his reply, Plaintiff did not proffer a specific response to Defendants' argument that the Land Use Survey is inadmissible. However, Plaintiff argues that his medical records and other evidence

disagrees. First, it was authenticated by Mr. Neidwski's declaration. (*See* Neidzwski Decl. ¶ 12.)

Second, the document does not lack foundation, as it is a government report, so the Court may

take judicial notice. *See Tribe v. McMahon*, No. EDCV151538DMGFFMX, 2017 WL 6883765, at

*6 (C.D. Cal. Sept. 5, 2017) (taking judicial notice of a "Land Survey"). Lastly, the document is

not inadmissible hearsay because the Court finds that it falls under the hearsay exception of a

"public record" under Federal Rules of Evidence 803(8). *See* Fed. R. Evid. 803(8) ("A record or

statement of a public office if: (A) it sets out: ... (i) a matter observed while under a legal duty to

report"); *Sw. Bell Tel. Co. v. City of El Paso*, 168 F. Supp. 2d 640, 648 (W.D. Tex. 2001)

("Exhibits 3–5 are admissible insofar as they are public land records and reports of public

agencies.") (citing Fed. R. Evid. 803(8)).

Accordingly, the Court finds that Drakes Estero is a navigable waterway, and that Plaintiff

is a seaman under the Jones Act.  Hence, the Court need not consider any evidence provided by

the parties for the worker's compensation claim, so there is no practical effect of striking the

supplemental evidence that the parties improperly submitted under Civil Local Rule 7-3(d).

### ii. Whether Plaintiff sustained an injury

The second element is whether Plaintiff was injured in the service of a ship. Plaintiff has

presented evidence that he was injured during his employment by way of medical records and

supporting declarations. (Medical Records, Neidzwski Decl., Ex. F; Zugsberger Decl. ¶¶ 5-6;

Decl. of Christina Florida, Dkt. No. 71 ¶¶ 4-6.)  On September 10, 2016, Plaintiff was seen by Dr.

Greene, who opined that Plaintiff's burns on his exposed skin was "[c]linically consistent with

chemical burn likely secondary to petrochemical or other toxic exposure." (Medical Records at 2.)

In opposition, Defendants, in failing to recognize the admiralty summary judgment

standard prescribed in *Barnes*,[2] effectively argue only that the declarations and supporting medical

records are inadmissible. (*See* Defs.' Mot. at 15-20.)  To the contrary, Plaintiff need only show

---

are authenticated and fall under hearsay exceptions, specifically "FRE 803(4) and/or 803(6), and
to the extent necessary, under FRE 807." (Pl.'s Reply at 12.)
[2] *See* discussion *supra* Part III, wherein the Court notes that, to prevail on a maintenance and cure
claim, Plaintiff need not show that there are no disputes of material fact that he was injured exactly
as claimed, the extent thereof, or even causation.

that he was injured during his three months in service of the ship, and his declaration and Dr. Greene's assessment, which was produced to Defendants and authenticated by Plaintiff's counsel, are sufficient to establish that he sustained some injury for the purposes of the maintenance and cure claim only. (*See* Neidzwski Decl. ¶ 7, Ex. F.)

Moreover, it is irrelevant to this claim whether Plaintiff reported the injury or need for medical treatment to his supervisor or to other employees, so that these facts are disputed is immaterial for the purposes of this motion. (*See* Defs.' Mot. at 17.)

Accordingly, the Court finds that Plaintiff sustained an injury in the service of the ship.

### iii. Whether Plaintiff is incurring expenses for medical treatment, board, and lodging

The third element is whether Plaintiff is incurring expenses for medical treatment, board, and lodging. There is no dispute that Plaintiff has been incurring living and medical expenses since his injury. (*See* Pl.'s Mot. at 20.)

In opposition, however, Defendants argue that Plaintiff has offered no evidence of his amount of medical expenses he has incurred, as he has submitted only one medical bill despite having received only four of forty treatments listed and having only paid for "some." (Defs.' Opp'n at 21.) Furthermore, Defendants argue that Plaintiff waiting for more than a year after his injury to seek maintenance and cure suggests that he was not suffering illness without aid. (Defs.' Opp'n at 21.) Plaintiff contends that the gap in timely medical treatment was due to Defendants' failure to pay maintenance or cure. (Pl.'s Mot. at 20.) The Court agrees that the realities of our health care system may preclude treatment if there is an inability to pay, and will not fault Plaintiff for not obtaining treatment prior to receiving funds for same.

Since there is no genuine dispute that Plaintiff has incurred some expenses for maintenance and cure, he satisfies this element.

### B. Amount of Maintenance and Cure

Since Plaintiff qualifies as an injured seaman under the Jones Act for the purposes of obtaining maintenance and cure, Plaintiff also moves for the undersigned to set the amount. (Pl's Mot. at 21.)

The summary judgment standard also governs a pretrial request to set a maintenance amount. *Barnes*, 889 F.3d at 539-40. Plaintiff bears the burden of presenting evidence sufficient for the court to estimate his actual costs. *Id.* at 540 (citing *Hall v. Noble Drilling (U.S.) Inc.*, 242 F.3d 582, 590 (5th Cir. 2001)). This evidentiary burden, however, "is 'feather light,' and a court may award reasonable expenses, even if the precise amount of actual expenses is not conclusively proved." *Barnes*, 889 F.3d at 540 (quoting *Hall,* 242 F.3d at 588) (internal quotations omitted). Furthermore, "[a] seaman need not present evidence of the reasonable rate; a court may take judicial notice of the prevailing rate in the district." *Barnes,* 889 F.3d at 540. Notwithstanding, should the court conclude that the plaintiff's actual expenses were inadequate to provide him with reasonable food and lodging, he is entitled to the reasonable cost of food and lodging. *Hall*, 242 F.3d at 590. This ensures that an injured seaman's "inability to pay for food and lodging in the absence of maintenance payments does not prevent him from recovering enough to afford himself reasonable sustenance and shelter." *Id.*

As the denial of summary judgment as to the maintenance amount would undermine the remedy's "easy and ready administration," the Ninth Circuit has identified two ways in which the problem may be mitigated. *Barnes*, 889 F.3d at 539. First, a seaman who demonstrates his entitlement can receive the portion of those expenses which are undisputed. *Id.* Second, a district court may hold an expedited trial on the claim under Federal Rule of Civil Procedure 42(b). *Id.*

### i. Maintenance

While the plaintiff bears the burden to provide an evidentiary basis for the court to estimate his actual costs, the burden is "feather light," such that seaman's testimony is sufficient to support an award of reasonable expenses. *See Barnes*, 889 F.3d at 540 (citing *Hall,* 242 F.3d at 588 (quoting *Yelverton v. Mobile Labs., Inc.*, 782 F.2d 555, 558 (5th Cir. 1986))).

Here, Plaintiff claims that his actual monthly expenses are as follows:

> Expenses averaging $37.26 per day while residing at his residence located at 10650 Rancheria Road, Upper Lake, California 95485 ("Upper Lake residence") from August 16, 2016 through March 1, 2017 and then from October 1, 2017 through February 14, 2018. (Zugsberger Decl. ¶¶ 9-10.)
>
> Expenses averaging $60.59 per day while residing at 1965 36th

Street Sacramento, California 95816 ("Sacramento residence") from March 1, 2017 through October 1, 2017. (Zugsberger Decl. ¶¶ 13-14.)

Expenses averaging $78.33 per day since renting his property at 8293 Lorient Place, Apt. 2432, Chula Vista, California 91913 ("Chula Vista residence") from February 15, 2018 through present date. (Zugsberger Decl. ¶¶ 11-12.)

(Pl.'s Mot. at 22.) The Court notes that the expenses from the Chula Vista residence include expenses from the Upper Lake residence. (*See* Zugsberger Decl. ¶¶ 12.) The Court is not inclined to award maintenance for two, separate residences, despite Plaintiff's claim that he lives and works in Chula Vista, in part to receive treatment from Dr. Greene. (Zugsberger Decl. ¶ 11.) Plaintiff, however, is entitled to recover maintenance for the Chula Vista residence, which is the more expensive of the two residences at $1600.00 per month, or $53.33 per day. *See id.*

In opposition, Defendants argue that they have not had the opportunity to challenge Plaintiff's "self-serving" cost-of-living assertions through discovery. (Defs.' Opp'n at 21.) Defendants are again conflating the typical summary judgment standard with summary judgment in the maintenance and cure context. In *Barnes,* the Ninth Circuit while agreeing with *Hall*, also adopted the Second Circuit's burden-shifting framework in *Incandela v. Am. Dredging Co.,* 659 F.2d 11, 14 (2d. Cir. 1981), which shifted the burden to the defendant to demonstrate that the actual expenditures were unreasonable once the plaintiff offered evidence of his actual living expenses. 889 F.3d at 541. Given admiralty's position that maintenance should be an easy remedy provided without delay, Defendants' failure to conduct discovery on this matter is unavailing. Thus, Defendants have failed to satisfy their burden of showing that Plaintiff's actual expenditures were unreasonable. *See Barnes,* 889 F.3d at 541 (The defendant's failure to submit evidence showing the purported maintenance amount was unreasonable resulted in the plaintiff carrying his burden that no genuine issue of material fact existed as to the reasonableness of his actual expenses.).

Accordingly, Plaintiff is entitled to past maintenance so long as the actual costs are reasonable. Plaintiff claims that he incurred $3,390.66 in maintenance for the Upper Lake residence, where he resided from December 1, 2016 through March 1, 2017, which is 91 days multiplied by $37.26 per day. (Zugsberger Decl. ¶¶ 9-10.) From March 2, 2017 through October 1,

2017, Plaintiff resided in Sacramento, which is 214 days multiplied by $60.59 per day, and totals $12,966.26. (Zugsberger Decl. ¶¶ 13-14.) Plaintiff returned to the Upper Lake residence from October 2, 2017 to February 14, 2018, which is 136 days multiplied by $37.26 per day, and totals $5,067.36. (Zugsberger Decl. ¶¶ 9-10.) Lastly, Plaintiff began residing at the Chula Vista residence on February 15, 2018 through the date of the September 28, 2018 hearing, which is 226 days multiplied by $53.33 per day, and totals $12,052.58. Thus, the total amount of past maintenance, as of September 28, 2018, is $33,476.86.

In Plaintiff's supplemental briefing, he addressed the prevailing rates in Upper Lake, Sacramento, and Chula Vista by focusing on two primary factors, (1) the reasonable costs in each region Plaintiff resided and (2) maintenance rates awarded in other cases for seamen in the same region.[3] (Pl.'s Suppl. Br. at 2.)

For (1) the reasonable costs in each region Plaintiff resided, Plaintiff asserts that the general cost of living in each location is evidence of reasonable costs. (*Id.* at 4.) (citing *Hall,* 242 F.3d at 592, n.46 ("We offer only the admonishment that uniform maintenance awards require that courts account of changes in the cost of living over time and between localities.")). Plaintiff then states that his maintenance calculations and rates are based upon his actual living expenses in (a) Upper Lake, California; (b) Sacramento, California and (c) Chula Vista, California, which were all "necessary to the provision of habitable housing" in these locations. (Pl.'s Suppl. Br. at 3.) Plaintiff further notes that cost of living statistics for each of the aforementioned three locations are based upon data from Sperling's Best Places, which calculate its costs of living indices on a U.S. average of 100: an amount below 100 in Sperling's statistics means that the location is cheaper than the U.S. average, and an mount above 100 means that the location is more expensive than the U.S.

---

[3] Plaintiff initially listed the four factors from *Barnes*: "In determining the reasonable costs of food and lodging, the court may consider [1] evidence in the form of the seaman's actual costs, [2] evidence of reasonable costs in the locality or region, [3] union contracts stipulating a rate of maintenance or per diem payments for shoreside food or lodging while in the service of a vessel, and [4] maintenance rates awarded in other cases for seamen in the same region." *Barnes*, 889 F.3d at 540 (citing *Hall*, 242 F.3d 582; *Yelverton*, 782 F.2d at 555-58). Then, Plaintiff noted, as reflected in the Court's Order (Dkt. No. 95), Plaintiff's actual maintenance costs ([1] above) are no longer at issue, and further, there was no union contract ([3] above). (Pl.'s Suppl. Br. at 2). Thus, the remaining factors to be assessed are [2] and [4] above. (*Id.*)

12

average. (*Id.*) (citing Suppl. Neidzwski Decl. at 11 (Ex. B at 1).))

For Upper Lake, its cost of living received a Sperling's statistic rating of 119.3 (19.30% higher than the U.S. average), its grocery costs received a rating of 116.1 (16.1% higher than the U.S. average), its housing costs received a rating of 133 (33% higher than the U.S. average), and the average studio apartment in Upper Lake rents for $684.00/month, and the average one bedroom apartment in Upper Lake rents for $726.00/month. (Pl.'s Suppl. Br. at 3-4.) (citing Neidzwski Decl. II at 11-12 (Ex. B at 1-2).) Plaintiff points out that his rent in Upper Lake is $500.00/month, "which is well below the average rent for studio and one bedroom apartments" and that his food costs are in excess of $367.80/month (or $12.26/day) are "well below reasonable costs, especially considering that Upper Lake's grocery costs are 16.1% higher than the U.S. average." (Pl.'s Suppl. Br. at 4) (citing Zugsberger Decl. ¶ 10.) Thus, Plaintiff concludes that in sum, comparing the above Sperling's statistics to his actual expenses in excess of $37.26/day for his Upper Lake residence demonstrates that his actual expenses for Upper Lake are well below reasonable expenses. (*Id.*)

For Sacramento, its cost of living received a Sperling's rating of 121.0 (21.00% higher than the U.S. average), its grocery costs received a rating of 111.8 (11.8% higher than the U.S. average), its housing costs received a rating of 149 (49% higher than the U.S. average), and the average studio apartment in Sacramento rents for $685.00/month and the average one bedroom apartment rents for $776/month. (Pl.'s Suppl. Br. at 4) (citing Suppl. Neidzwski Decl. at 17 (Ex. C at 2), 21-22 (Ex. D at 1-2).) Plaintiff points out that his expenses were in excess of $60.59/day while residing at his Sacramento residence (Zugsberger Decl. ¶ 14) and his rent there was $1200/month, which even though is above average in Sacramento according to the above Sterling's ratings, this rent "was necessary for Plaintiff to live in a decent area and was actually below reported rent for both 480 square feet and 900 square feet accommodations in 'normal' areas of Sacramento. (Pl.'s Suppl. Br. at 5) (citing Suppl. Neidzwski Decl. at 26-32 (Ex. E).) Similar to Upper Lake, Plaintiff further indicates that his food costs of $367.80/month are well below reasonable costs in Sacramento and notably, $12.26/day would not even cover two meals, without large fries and large drink and with taxes, at the McDonald's at 3006 K Street, Sacramento,

California 95816, approximately 1.1 miles from Plaintiff's Sacramento residence. (Pl.'s Suppl. Br. at 5) (citing Suppl. Neidzwski Decl. at 33-37 (Ex. F).) Therefore, Plaintiff concludes that in sum, comparing his actual expenses in Sacramento with the reasonable expenses in the area, his actual expenses of $60.59/day for food and lodging are below reasonable costs. (Pl.'s Suppl. Br. at 5.)

For Chula Vista, its cost of living received a Sperling's rating of 154.0 (54.00% higher than the U.S. average), its grocery costs received a rating of 106.8 (6.8% higher than the U.S. average), its housing costs received a rating of 255 (155% higher than the U.S. average) and the average studio apartment in Chula Vista rents for $1,298.00/month and the average one bedroom apartment rents for $1,430/month. (Pl.'s Suppl. Br. at 5-6) (citing Suppl. Neidzwski Decl. at 40 (Ex. G at 2), 44-45 (Ex. H at 1-2).) Plaintiff asserts that his rent of $900.00/month in Chula Vista (Zugsberger Decl. ¶ 12) is far below the average rent for a studio and one bedroom apartment in the area according to the Sperling's rating, and that his food costs of $450.00/month (approximately $15.00/day) are also below reasonable. As a result, Plaintiff concludes that his combined rent and utilities in Chula Vista and Upper Lake were also reasonable as he was forced to simultaneously pay living expenses in those two localities so that he could obtain some of his needed medical treatment at Dr. Greene's clinic. (Zugsberger Decl. ¶¶ 11-12.)

For (2) the maintenance rates awarded in other cases for seamen in the same region, even though Plaintiff states that no federal or state case law was found setting maintenance rates for other seamen in Upper Lake, Sacramento, or Chula Vista, an examination of historical maintenance rates reflects that his actual expenses and corresponding proposed maintenance rates are consistent with, or below, the upward progression of daily maintenance rates, based upon yearly inflation. (Pl.'s Suppl. Br. at 6-7) (citing *Hall*, 242 F.3d at 582, 591-92 n.42-46 (The Fifth Circuit summarizing that in the 1940s until the 1970s, a maintenance rate was usually $8.00/day); *Barnes*, 889 F.3d 517, 540 n.19 ("From the 1940s until the 1980s, the reasonable rate was generally held by courts to be eight dollars per day, despite the deteriorating value of that fixed amount over four decades...More recently, courts have allowed [a] seaman to prove that higher costs of living require a higher maintenance amount.") (citations and internal quotes omitted)).

Plaintiff further notes that in the late 1970s and early 1980s, the Fifth Circuit affirmed

14

awards of $15.00/day, $20.00/day and $30.00/day, and in the *Hall* case, the Fifth Circuit upheld the district court's finding that maintenance rates of $30.50/day and $31.50/day were reasonable amounts for single seamen, noting that a $15.00/day award in 1978 was equivalent to $38.35/day in 1999 dollars and a $20.00/day award in 1981 was equivalent to approximately $36.68/day in 1999 dollars. (Pl.'s Suppl. Br. at 7) Plaintiff also points out that using the Bureau of Labor Statistics CPI Inflation Calculation, July 2018 equivalent buying power amounts for $8.00/day from the month of January in the following years are: 1945 ($113.26), 1950 ($85.79), 1955 ($75.51), 1960 ($68.81), 1965 ($64.62), 1970 ($53.33), 1975 ($38.70). (*Id.* at 8-9.) Moreover, Plaintiff states that using the same CPI Inflation Calculator, $15.00 in January 1978 has the same buying power as $60.48 in July 2018 and $20.00 in January 1981 has the same buying power as $57.93 in July 2018. (*Id.* at 9) (citing Zugsberger Decl. ¶ 11.)

Accordingly, Plaintiff concludes that his actual expenses in each of the three aforementioned locations are either well below or roughly equivalent to the (1) $8.00/day rate typically awarded by the Fifth Circuit from 1945-1960, (2) $15.00/day rate awarded in 1978, and (3) $20.00/day rate awarded in 1981, and given the high cost of living in those three locations, Plaintiff's reasonable maintenance rates should exceed the buying power of those historical uniform rates. (Pl.'s Suppl. Br. at 8.) Plaintiff asserts that his reasonable maintenance rates should exceed (1) a $20.00 rate in January, 1981 (equaling $57.93/day today), (2) a $15.00 rate in January, 1978 (equaling $60.48/day today) and (3) the average $8.00 rate from 1945-1965 (equaling well over $60.00/day today). (*Id.*) Moreover, Plaintiff argues that given his ongoing denial of all maintenance and cure required for him to move to Chula Vista to receive treatment from Dr. Greene (Zugsberger Decl. ¶¶ 11-12), his claim of simultaneous rent and utilities in Upper Lake and Chula Vista is reasonable as well. (*Id.*)

In light of the foregoing, the undersigned finds that the past and present maintenance amounts are reasonable, particularly in light of the fact that costs in Northern District of California frequently exceed Plaintiff's actual costs. *See Hall*, 242 F.3d at 589 (A seaman may recover his actual expenses if they are less than the reasonable cost of food and lodging in his locality.) The historical comparisons and extrapolations of rates awarded by the Fifth Circuit are also convincing

in establishing that Plaintiff's maintenance rates are reasonable as well.

Accordingly, Plaintiff is entitled to past maintenance in the amount of $33,476.86, and $53.33 in maintenance per day going forward until he has reached maximum cure for his injuries, subject to modification after trial.

### ii. Cure

Plaintiff contends that Defendants waived their opportunity to deny his claim for maintenance and cure, because they failed to perform a prompt and diligent investigation. (Pl.'s Mot. at 24.) In his moving papers, however, Plaintiff does not explicitly explain what additional care he requires, and the undersigned declines to find that Defendants have waived their opportunity to contest the cure sought. (*See* Pl.'s Mot. at 20.)

In opposition, Defendants argue that Plaintiff has failed to offer any evidence of incurred medical expenses entitled him to cure payments. (Defs.' Opp'n at 20.) While the fact that Plaintiff has not obtained all of the necessary medical treatment does not foreclose recovery, the Court agrees that Plaintiff did not sufficiently address his need for medical treatment. As a result, and due to the Ninth Circuit's preference for prompt payment contemporaneous to the illness or injury, the Court ordered supplemental briefing rather than deny the motion as it pertained to the cure portion of the fourth cause of action. *See Barnes,* 889 F.3d at 543.

In his supplemental brief, Plaintiff incorporates the Declaration of Dr. David Greene (Green Decl.) in its entirety. As set forth in his declaration, Dr. Greene treated Plaintiff before and after the project giving rise to this action. (Greene Decl. ¶¶ 7-25.) Prior to the project, Plaintiff passed routine dive physicals performed periodically by Dr. Greene since March 2013 and Plaintiff did not exhibit any symptoms of toxic or chemical exposure. (*Id.* ¶¶ 7-8.) During the project, on September 10, 2016, Plaintiff was evaluated and diagnosed by Dr. Greene with progressive erythema, blistering and desquamation, which Plaintiff reported began during his dive work while removing pilings and creosote treated lumber, and these conditions on Plaintiff's body were consistent with chemical burns caused by petrochemical or other toxic exposure, according to Dr. Greene. (*Id.* ¶¶ 9, 11.) The progression of Plaintiff's symptoms from September 2016 through February 2018 was also consistent with conditions caused and/or aggravated by

petrochemical or other toxic exposure and all likely related to Plaintiff's conditions which Dr. Greene observed during the project on September 10, 2016. (*Id.* ¶¶ 12-21.) Plaintiff avers that Dr. Greene's treatment recommendations on February 28, 2018 (*Id.* ¶¶ 19-20) all likely relate to the conditions which Dr. Greene diagnosed and observed in Plaintiff on September 10, 2016 (*Id.* ¶ 27.) These recommendations consist of a neurology consultation, an interventional radiology consultation for biopsy of hepatic and bone tissue, a gastroenterology consultation, and forty (40) additional hyperbaric oxygen treatments. (*Id.*) Dr. Greene also concurs with Dr. Neal Varghis' recommendation of an EMG/NCS of Plaintiff's bilateral upper and lower extremities. (*Id.* ¶¶ 31-32.) As reflected in Dr. Greene's invoice attached as Exhibit B to his declaration (*Id.* at 14-15), Plaintiff currently owes Dr. Greene a total of $32,000 for past treatment related to Plaintiff's conditions sustained during the project. (*Id.* ¶ 24.)

Plaintiff argues that to date, no amount of maintenance or cure has been paid or authorized by Defendants and Defendants have continued to deny their ongoing maintenance and cure obligation with no medical evidence offered to date. (Pl.'s Suppl. Br at 10.) Plaintiff further asserts that he has not reached maximum medical improvement, remains in need of medical care which he cannot receive, and cannot pay basic bills and in sum, his condition is exigent. (*Id.*) Thus, Plaintiff requests that the Court grant his Motion for Partial Summary Judgment. (*Id.*)

### C.    Defendants' Objections

Defendants raise a number of objections to the evidence Plaintiff submitted in his reply for his motion for partial summary judgment. (Defs.' Obj. at 1-5.)

Defendants argue that Exhibit A in the Declaration of Nicholas J. Neidzwski in support of Plaintiff's reply for the motion for partial summary judgment (Reply Neidzwski Decl., Ex. A) is inadmissible based on inadequate authentication provided by Mr. Neidzwski in paragraph 2 (Reply Neidzwki Decl. ¶ 2) because Mr. Neidzwski offered no facts regarding whether the photograph has been altered or is an accurate representation of the scene photographed, nor has he offered facts regarding whether the photograph represents the scene at the time Plaintiff worked in Drakes Estero, that is, August through November of 2016. (Defs.' Obj. at 2.) Defendants further contend that even under the evidentiary standard for a non-moving party, which Plaintiff attempts

17

United States District Court
Northern District of California

to apply to himself (Pl.'s Reply at 11), Exhibit A would be inadmissible at trial based on the inadequate authentication provided by Mr. Neidzwski in paragraph 2. (Defs.' Obj. at 2.) The website offered by Mr. Neidzwski for Exhibit A also indicates that a person, presumably named Bobbi Simpson, created the image and Mr. Neidzwski has not indicated whether this person would be available to authenticate this image at trial. (*Id.*; Reply Neidzwski Decl. ¶ 9.) Defendants also argue that Exhibit A is inadmissible because it is not relevant to the issues in this case. (Defs.' Obj. at 2.) Defendants point out that the website in Exhibit A indicates the image was created on February 15, 2012, and even if Mr. Neidzwski could offer facts establishing the truth of that creation date and that the image accurately represented the scene, Defendants argue that the image would not be relevant because it predates Plaintiff's work in Drake Estero by over four years, and Plaintiff has also offered no facts to establish that an image from February 2012 would accurately depict Drakes Estero as it appeared in August through November of 2016. (*Id.* at 2-3.) Defendants then cite a Ninth Circuit case to argue that the case quote of "[w]hen once found to be navigable, a waterway remains so" refers to determining navigability for the purposes of determining the extent of the commercial power of Congress, which is distinct from navigability determinations for the purpose of determining admiralty jurisdiction. (*Id.*)

Defendants next argue that Exhibit B (Reply Neidzwski Decl., Ex. B) in the same above-discussed Declaration (Reply Neidzwski Decl.) is inadmissible based on the inadequate authentication provided by Mr. Neidzwski in paragraph 3 (Reply Neidzwski Decl. ¶ 3) because Mr. Neidzwki does not have knowledge of the creation of the email. (Defs.' Obj. at 3.) Defendants object to the admissibility of Exhibit B for reasons similar to why they object to the admissibility of Exhibit A e.g., Mr. Neidzwski does not indicate whether the author of Exhibit B is available to testify at trial, and because Exhibit B is not relevant to the issues in the case because Plaintiff seeks to use the email to establish when Defendants first received notice of his alleged injuries and such notice is not one of the elements of his claims for maintenance and cure. (*Id.* at 3-4.)

Defendants then argue that paragraphs 4, 6, 7 and 8 and Exhibits C, D and E of the Declaration of Mr. Neidzwski discussed immediately above (Reply Neidzwski Decl.) and Exhibits C, E, F, and G of the first Declaration of Mr. Neidzwski (Neidzwski Decl.) are inadmissible

medical records that are unauthenticated and unable to support summary judgment because Mr. Neidzwski offers no personal knowledge as to how the records were created, how they were stored, or whether they have been altered since their creation. (Defs.' Obj. at 4.) Defendants additionally argue that even though purported medical records (Neidzwski Decl., Exs. C, E, F, G) might be admissible under an exception to the hearsay rule, Plaintiff has offered no facts showing that the statements made in the aforementioned exhibits meet the requirements of any exception. (Defs.' Obj. at 4.)

Defendants further argue that paragraph 5 in the Reply Declaration of Mr. Neidzwski (Reply Neidzwski Decl.) and Exhibit D in the first Declaration of Mr. Neidzwski (Neidzwski Decl.), an expert report, are inadmissible, with the expert report being unsworn and not made under penalty of perjury and thus unable to support summary judgment because Mr. Neidzwski offers no personal knowledge as to how the expert report was created, how it was stored, or whether it has been altered since creation. (Defs.' Obj. at 4-5.)

Finally, Defendants argue that Mr. Clary's statement that "[o]n one occasion during his employment, Mr. Zugsberger mentioned having a rash that he suggested was caused by algae in the water" (Pl.'s Reply at 9-10; Neidzwski Decl., Ex. J at 1) is inadmissible because Mr. Clary has no personal knowledge of what Plaintiff, Mr. Zugsberger, mentioned during his employment. (Defs.' Obj. at 5.)

To the extent that Defendants object to the admissibility of Plaintiff's medical evidence as described in detail above, those issues have been sufficiently resolved via Plaintiff's supplemental briefing. Accordingly, Defendants' objections are overruled.

### D. Defendants' Response to Plaintiff's Supplemental Briefing

In their response to the supplemental briefing, Defendants argue that the Court should reject Plaintiff's claims for unneeded cure and unreasonable maintenance for several reasons. (Defs.' Resp. at 1.) First, Defendants argue that their cure obligation does not cover Plaintiff's election to receive expensive and unreasonable care rather than free care. (*Id.* at 1-4.) Second, Defendants contend that the Court should strike or exclude Plaintiff's new evidence of causation, including Dr. Greene's new testimony regarding causation, which violates the Court's order and

gives Defendants no chance to respond (*Id.* at 4-5) and is not admissible because Dr. Greene is not qualified on the subject and his opinions are not based on reliable facts (*Id.* at 5-9). Specifically, Defendants assert that Dr. Greene is not qualified to testify as to whether or not chemical or toxic exposure caused Plaintiff's injuries (*Id.* at 6-7), his opinions on causation are not based on sufficient facts and data (*Id.* at 7-8), and his failure to perform differential diagnoses means his opinions on causation are not based on reliable methods (*Id.* at 8-9). Defendants additionally aver that if the Court considers Plaintiff's new evidence of causation, it should also consider evidence from Defendants' expert, Dr. Jonathan S. Rutchik, and allow him to examine Plaintiff. (*Id.* at 9.) Finally, Defendants argue that Plaintiff's claim for rent and utilities for a house in Upper Lake and an apartment in Chula Vista at the same time is unreasonable because a jury would not find it reasonable, Plaintiff offers no explanation as to why he could not move out of the Upper Lake house he was renting or find a subtenant when he moved to Chula Vista, and Plaintiff also offers no explanation as to why he could not obtain treatment closer to home so that he would not have to move. (*Id.* at 9-10.)

Although Defendants attempt to address Plaintiff's supplemental briefing in their response, the Court finds Defendants' arguments largely unavailing because the Court has already performed the analysis in determining that Plaintiff should be entitled to maintenance and cure, as detailed above. As a result, Plaintiff has proven that there is no disputed question of fact as to instatement of maintenance and cure, payment of past maintenance and cure, and to a proper setting of the maintenance rate as well.

## IV.    CONCLUSION

In light of the foregoing, the Court GRANTS Plaintiff's motion for partial summary judgment, as follows:

1.    Defendants Galindo Construction Company, Inc. ("Galindo Construction") and Don Ron Galindo ("Ron Galindo") must pay, within 60 days from the date of this order, all cure incurred by Plaintiff during or since his employment with Galindo Construction and Ron Galindo from August 2016 through November 2016.

2.    Defendants Galindo Construction and Ron Galindo must pay, within 60 days from

the date of this order, past maintenance owed to Plaintiff through the date of this order, September

28, 2018, in the total amount of $33,476.86.  The past due maintenance amount is calculated as

follows:

•       December 1, 2016 through March 1, 2017:  $3,390.66 (91 days multiplied by

$37.26 per day);

•       March 2, 2017 through October 1, 2017:  $12,966.26 (214 days multiplied by

$60.59 per day);

•       October 2, 2017 through February 14, 2018:  $5,067.36 (136 days multiplied by

$37.26 per day);

•       February 15, 2018 through the date of this order, September 28, 2018:  $12,052.58

(226 days multiplied by $53.33 per day).

3.      Plaintiff has not reached maximum cure for his injuries which manifested during

the Project.

4.      Defendants Galindo Construction and Ron Galindo must pay Plaintiff maintenance

at the rate of $53.33 per day on an ongoing basis from September 28, 2018 forward until (1)

Plaintiff reaches maximum cure for his injures which manifested during the Project, at which time

Defendants' maintenance obligation will cease, (2) until Plaintiff's living expenses change, at

which time Plaintiff's maintenance rate may change, or (3) subject to modification after trial.

5.      Defendants Galindo Construction and Ron Galindo must pay and authorize on an

ongoing basis all reasonable cure incurred by Plaintiff on or after the date of this Order until

Plaintiff reaches maximum cure for his injuries which manifested during the Project.  This cure

includes, but is not limited to, the following:  (1) an EMG/NCS of Mr. Zugsberger's bilateral

upper and lower extremities as recommended by Neal Varghis, MD, on or around February 1,

2018; (2) an appointment with Dr. Jonathan S. Rutchik, as recommended by John H. Fullerton,

MD, MRO, CMD, CFP, FACP, AGSF, FAAHP; and (3) all recommended treatment as set forth

by Dr. David Greene in his February 28, 2018 chart record. (Neidzwski Decl., Ex. F at 5).

//

//

IT IS SO ORDERED.

Dated: September 28, 2018

_____
KANDIS A. WESTMORE
United States Magistrate Judge